IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| AMBER PETTY, | § | |
|---|---|---|
| Plaintiff, | § | |
| | § | |
| v. | § | EP-18-CV-120-DB |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

On this day, the Court considered Defendant United States of America's ("Defendant") "Opposed Motion to Exclude the Testimony of Plaintiff's Expert, Dr. James Ingaglio" ("Motion") filed in the above captioned case on August 9, 2019. On September 9, 2019, Plaintiff Amber Petty ("Plaintiff") filed her "Response in Opposition to Defendant's Motion to Exclude Testimony of Dr. James Ingaglio, M.D." ("Response"). On September 16, 2019, Defendant filed its Reply. After due consideration, the Court is of the opinion that Defendant's Motion shall be denied.

## BACKGROUND

On April 10, 2019, Plaintiff filed her original complaint alleging an action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and § 2671, against Defendant. Complaint 1, ECF No. 1. The Department of the Army is an agency of Defendant. *Id.* Thus, Defendant, through its agency, owns and operates the army hospital in El Paso, TX where Plaintiff received medical treatment. *Id.* Plaintiff alleges that Defendant was negligent in one or more of the following ways: "1. Causing a perforated uterus and injury to the broad ligament during the D&C procedure; and 2. Failing to timely recognize and treat a perforation of the uterus."

*Id.* at 3. Plaintiff seeks damages for pain and mental anguish, physical impairment, and medical expenses. *Id.*

On September 6, 2014, Plaintiff gave birth by cesarean section ("c-section") at a civilian hospital. Mot. 1, ECF No. 17. On September 16, 2019, she returned to the civilian hospital and was admitted out of concern for a post-surgical abscess and cellulitis. *Id.* (citing Ex. 1, THOP-East Campus medical records, at 000010). A pelvic ultrasound showed a bulky uterus and endometrial thickening. *Id.* On examination, Plaintiff had material coming out of part of the c-section surgical incision. *Id.* The following day, Plaintiff was taken to surgery and the incision was opened and drained. *Id.* Plaintiff was discharged; she went home with a vacuum-assisted closure of her wound. *See id.* Ex. 2 at 2.

Plaintiff transferred her gynecologic care to the army hospital on or about September 24, 2014, when she had concerns about her slow healing c-section incision. *Id.* at 2; Complaint 2, ECF No. 1. At an outpatient clinic visit on October 7, 2014, Plaintiff complained of continued vaginal bleeding and passing clots since her c-section. Mot. 2, ECF No. 17; Complaint 2, ECF No. 1. On October 14, 2014, at the army clinic Dr. Erin Keyser ("Dr. Keyser"), an attending physician, evaluated Plaintiff for the bleeding, performed a vaginal ultrasound, and noticed a thickened endometrial stripe that was four centimeters and irregular. Mot. 2, ECF No. 17. Dr. Keyser suspected retained products of conception and recommended that Plaintiff undergo a dilation and curettage ("D&C") after she explained the risks associated with the procedure. *Id.* The same day, Plaintiff underwent an ultrasound-guided D&C that Dr. Naima Khamsi ("Dr. Khamsi"), a third-year resident receiving training at the army hospital, primarily performed under the supervision of Dr. Keyser. *Id.* Plaintiff was discharged on October 15, 2014. Complaint 2, ECF No. 1.

Plaintiff returned to the army hospital on October 19, 2014 and was seen in the ER where she complained of fever, chills, and pain. *Id.* A CT scan showed what was a suspected uterine hematoma and uterine perforation. *Id.* The next day Dr. Keyser took Plaintiff to the operating room. *Id.* at 30. Although Plaintiff went into surgery for an exploratory laparotomy, Dr. Keyser felt a hysterectomy was their only option because of the poor quality of the tissue. *Id.* The operative report noted evidence of a uterine perforation at the right posterior cornua, and a hematoma in the right broad ligament. *Id.* A pathology report prepared on October 20, 2014, noted "[t]he endometrial cavity is reddish brown and hemorrhage with gross penetration to the serosa of the lower uterine segment and fundus." Army Hospital Surgical Pathology Report 2, ECF No. 17–6.

The trial for this case is scheduled for November 19, 2019. In preparation for trial, Plaintiff designated Dr. James Ingaglio, M.D. ("Dr. Ingaglio"), a board-certified obstetrician and gynecologist, to provide an expert opinion with regard to the "standard of care for physicians in the performance of D[&]C." Pl.'s Designation of Experts 1, ECF No. 12; Dr. Ingaglio Report 2, ECF No. 17–8. In his expert report, Dr. Ingaglio opined that the army hospital breached the standard of care by causing the perforation in the cornual region and not timely recognizing the perforation, which is a known complication of the D&C procedure with a heightened risk in the post-partum patient. Dr. Ingaglio Report 3, ECF No. 17–8. Based on the extent of the injury to the right posterior uterine wall and into the right broad ligament, Dr. Ingaglio deems it most likely that due care was not taken when one of the army doctors inserted a sharp curette during the D&C procedure. *Id.* Also, according to Dr. Ingaglio, the injury was not timely recognized given that the D&C was performed with ultrasound guidance and Plaintiff was administered multiple medications in order to control significant bleeding during the

3

procedure. *Id.* Then she was discharged and only diagnosed four days later. *Id.* According to Dr. Ingaglio, the hysterectomy was not necessary both because a quicker diagnosis would have led to a better prospect for a less invasive solution and because the uterus that the army doctors removed was healthy. Dr. Ingaglio Report 3, ECF No. 17–8. Although Dr. Ingaglio acknowledges that there was a foul odor near the right broad ligament noted in the medical records during the hysterectomy, he attributes this, and the possible infection that the odor indicated, to the previous c-section site that was described as likely necrotic in pathology report. *See* Dr. Ingaglio Dep. Tr., ECF No. 17-9, at 50:7-8; 65:7-8; Dr. Ingaglio Report 3, ECF No. 17–8. Defendant filed its Motion to exclude Dr. Ingaglio's testimony because his opinions are based on insufficient evidence, his opinions are unreliable, and he is not qualified to offer an expert opinion on pathology. Mot. 3, ECF NO. 17. For the reasons that follow, the Court disagrees.

## STANDARD

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, provide a framework for determining whether expert testimony is admissible. 509 U.S. 579 (1993); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). In *Daubert*, the Supreme Court assigned to trial courts the duty of deciding whether expert testimony under Rule 702 is "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "In the vast majority of cases, the district court first should decide whether the factors mentioned in *Daubert* are appropriate. Once it considers the *Daubert* factors, the court then can consider whether other factors, not mentioned in *Daubert*, are relevant to the case at hand." *Black v. Food Lion, Inc.*, 171 F.3d 308, 311–12 (5th Cir. 1999).

The Advisory Committee notes to Rule 702 speak to the problem in today's case: when facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. *Pipitone v. Biomatrix, Inc.*, 299 F.3d 239, 249 (5th Cir. 2002). The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other. *Id.* (citing Fed. R. Evid. 702 advisory committee's note). It bears reminding that "the trial court's role as gatekeeper [under *Daubert* ] is not intended to serve as a replacement for the adversary system." *Id.* (citing Fed. R. Evid. 702 advisory committee's note, citing *United States v. 14.38 Acres of Land More or Less Situated in Leflore County, MI*, 80 F.3d 1074, 1078 (5th Cir. 1996)). Rather, as *Daubert* makes clear, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Daubert*, 509 U.S. at 596).

## ANALYSIS

Defendant moves to exclude the testimony of Dr. Ingaglio because he is unqualified and his opinions are unreliable and irrelevant. Mot. 3, ECF No. 17. According to Defendant, Dr. Ingaglio's opinion that the Plaintiff's uterus was healthy is based entirely on his own interpretation of the uterus pathology report, despite not being a pathologist, and despite not being able to adequately explain the report. *Id.* Further, in forming this opinion, he disregards the hysterectomy operative note, and dismisses Dr. Keyser's deposition testimony, rather than explaining why his opinion is valid notwithstanding this evidence to the contrary. *Id.* at 3–4. Additionally, Defendant moves to exclude this testimony as irrelevant because Plaintiff's Complaint does not allege Defendant unnecessarily removed a healthy uterus. *Id.* at 4.

5

Plaintiff counters that Dr. Ingaglio has based his opinion on her pertinent medical records from the army hospital and he has taken into consideration the deposition testimony of Dr. Keyser and Dr. Khamsi. Resp. 1, ECF No. 20. Thus, there is enough evidence to support his opinions. *Id.* And Dr. Ingaglio's opinions are reliable because they are based on the pertinent medical records produced in this case, and based on his education, training and experience as a Board Certified OBGYN physician. *Id.* Dr. Ingaglio properly indicates his reliance on the pathology reports, authored by another Defendant employee (pathologist from army hospital). *Id.* at 1–2. Dr. Ingaglio also addresses conflicting testimony in the deposition of Dr. Keyser. *Id.* at 2. He doesn't ignore or disregard it, rather he disagrees with it. *Id.* Dr. Ingaglio's opinions are relevant and consistent with Plaintiff's Complaint. *Id.* The Court agrees with the Plaintiff.

## I. Despite Not Being a Pathologist, Dr. Ingaglio Is Qualified to Give His Expert Opinion on the Medical Reports.

Defendant largely relies on *Matosky v. Manning* to support its argument that Dr. Ingaglio is unqualified and that his testimony is based on insufficient evidence and is unreliable. Mot. 8–9, ECF No. 17 (citing *Matosky v. Manning*, No. SA–07–CA–51–OG, 2010 WL 11545584, at *6 (W.D. Tex. 2010). In *Matosky*, our sister court sitting in San Antonio excluded an expert's testimony. *Matosky*, No. SA–07–CA–51–OG, 2010 WL 11545584, at *6. There, the doctor's qualifications were a legitimate concern because he was a general surgeon offering expert testimony on the plaintiff's pericardial effusion and cardiac tamponade (the purview of cardiologists and cardiothoracic surgeons), which he did not have experience treating or diagnosing. *Id.* at *2. Here, Dr. Ingaglio is a board certified OBYGN who also acts as a clinical professor teaching resident doctors, like Dr. Kamsi—the resident at the army hospital who performed Plaintiff's D&C. Dr. Ingaglio Dep. Tr., ECF No. 17-9, at 11:2-11. He

maintains an active OBGYN practice in the greater Los Angeles area and has performed numerous D&C procedures, c-sections, as well as hysterectomies, the same medical procedures at issue in this case. *Id.* at 12:18-20; Dr. Ingaglio Report, ECF No. 17-8, at 2. Also relevant, he has managed complications from the D&C procedure, including uterine perforation. Dr. Ingaglio Report, ECF No. 17-8, at 2. Thus, in contrast to the doctor in *Matosky*, Dr. Ingaglio's qualifications are not a cause for concern.

Specifically, Defendant also argues that Dr. Ingaglio is not qualified to testify as an expert in pathology. Mot. 7, ECF No. 17. Defendant cites another district court case, this time out of the Northern District of Texas, *Kallassy v. Cirrus Design Corporation*, for the rule that "[a] doctor does not qualify as an expert in all medicine just because the doctor qualifies as an expert in one medical field." No. CIV.A. 3:04-CV-0727N, 2006 WL 1489248, at *7 (N.D. Tex. 2006), aff'd, 265 Fed. App'x 165 (5th Cir. 2008). However, in *Kallassy* the excluded doctor was an orthopedic surgeon with extensive experience treating sport-related injuries, so it was "not at all evident that [the excluded doctor's] knowledge in orthopedics (i.e., bones) qualifie[d] him to determine the cause of Kallassy's neuropathy (i.e., a nervous system disorder)." *Id.* This case is inapposite for the same reasons that *Matosky* does not militate exclusion. *See supra* 6–7. Furthermore, this Court disagrees with Defendant's argument's premise that Dr. Ingaglio is testifying as an expert in pathology when he is merely offering his expertise in reading pathology reports as they pertain to obstetrics and gynecology, which he has ample expertise in as described above. Dr. Ingaglio Report 3, ECF No. 17-8; *see supra* 6–7.

## II. Dr. Ingaglio's Testimony Is Relevant to Plaintiff's Cause of Action Because It Tends to Make Breach and Damages More Probable.

While the Court finds Dr. Ingaglio qualified, his opinions still must be relevant to the plaintiff's action. Under Texas law, the plaintiff in a medical malpractice action bears the

burden of proving (1) the physician's duty to act according to an applicable standard of care; (2) a breach of that standard of care; (3) injury; and (4) causation. *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008). To establish causation, Plaintiff must produce evidence that by a "reasonable medical probability" or "reasonable probability" the United States caused, at least in part, Plaintiff's injury. *Ellis v. United States*, 673 F.3d 367, 373 (5th Cir. 2012). Plaintiff's Complaint alleges the United States, and agents of the United States, were negligent in (1) causing a perforated uterus and injury to the broad ligament during the D&C procedure, and (2) in failing to timely recognize and treat a perforation of the uterus. Complaint 3, ECF No. 1.

Defendant makes much of this exchange: after Defendant's attorney asked, "[w]hy is it that you believe that the perforation caused the hysterectomy?" Dr. Ingaglio testified, "I don't think it did. I don't think she needed a hysterectomy, to be honest with you." Dr. Ingaglio Dep. Tr. 18, ECF No. 17–9, at 65:5–8. Defendant argues that by acknowledging the uterine perforation did not cause the need for the hysterectomy, Dr. Ingaglio cannot establish that any alleged breach of the standard of care in perforating the uterus was the cause of Plaintiff's injury. Mot. 9, ECF No. 17. Moreover, his testimony that Plaintiff did not need the hysterectomy and the army doctors removed a healthy uterus is also irrelevant because Plaintiff has not made that allegation in her Complaint. *Id.*

However, as Defendant acknowledges, Plaintiff has alleged in her Complaint that Defendant negligently caused a perforated uterus and injury to the broad ligament during the D&C procedure and failed to timely recognize and treat that perforation of the uterus. *Id.* Defendant's argument mistakenly relies on the premise that Plaintiff's injury was the hysterectomy, however, the injury alleged is the perforation itself and its untimely treatment. Complaint 1, ECF No. 1. And Dr. Ingaglio's opinion that the hysterectomy was unnecessary

8

goes to multiple elements of Plaintiff's medical malpractice claim—namely, the army doctors' breach of the standard of care in failing to timely identify the perforation and failing to adequately treat it with the least invasive procedure. Dr. Ingaglio Dep. Tr. 18–19, ECF No. 17-9, at 65:7–25, 66:1–3. Dr. Ingaglio's opinion that the hysterectomy was not necessary also tends to make damages, for example: the cost of repeated visits to the army hospital, more likely. *Id.* His testimony, including his opinion that the hysterectomy was not necessary, is relevant.

### III. Dr. Ingaglio's Opinions Are Based on Sufficient Evidence and Are Reliable.

Among the conditions imposed by the Federal Rules of Evidence on the admissibility of expert opinion testimony is that the testimony be "based on sufficient facts or data." Fed. R. Evid. 702(b). Under the framework explained in *Daubert*, "Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir.2012) (internal quotation marks omitted). The *Daubert* reliability analysis applies to, among other things, "the facts underlying the expert's opinion." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (internal quotation marks omitted). An opinion based on "insufficient, erroneous information," fails the reliability standard. *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009) (affirming exclusion of expert opinion that relied on false assumptions rebutted by undisputed record evidence). Although the *Daubert* reliability analysis is flexible and the proponent of the expert evidence need not satisfy every one of its factors, *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004), "the existence of sufficient facts . . . is in all instances mandatory." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

Again, Defendant relies on *Matosky* in which the doctor was excluded after giving expert testimony that the fine needle breast aspiration that the defendant performed caused the

plaintiff's pericardial effusion and cardiac tamponade. No. SA–07–CA–51–OG, 2010 WL 11545584, at *2. There the doctor admitted *"never"* experiencing, hearing of, or reading about "an injury to a patient's heart during a fine needle aspiration[.]" *Id.* at *3 (emphasis in original). The court concluded that the doctor's "theory has not been studied, tested, peer reviewed, published or accepted in the relevant medical community," which was one reason for the expert being excluded. *Id.*

Furthermore, Matosky's doctor's "failure to consider far more common and well known causes of pericardial effusion and cardiac tamponade also affects the reliability of his opinion." *Id.* at *5. Matosky had been hospitalized the week before the relevant surgery with a viral syndrome. *Id.* Every physician deposed in her case agreed that a viral infection is one of the more common causes of pericariditis, yet this was never mentioned in the excluded expert's report. *Id.* There the court reasoned that while an expert can certainly disagree with other experts, "his conclusory opinion that '[s]uch injuries do not occur in the absence of negligence' and there was 'no other etiology suggested in the medical records' reflects a complete disregard for important facts and basic medical principles that would have required ruling out other causes." *Id.* at *6.

In this case, Dr. Ingaglio gives his expert opinion that due care was not met based on the extent of Plaintiff's injury to the right posterior uterine wall and in the right broad ligament, which was documented in the pathology report that described a grossly evident penetration to the serosa of the lower uterine segment and fundus. Dr. Ingaglio Report 2, ECF No. 17-8. In his opinion, Plaintiff's injury, a perforated uterus, was most likely caused by one of the sharp curettes used in the D&C procedure. *Id.* at 3. Unlike the doctor in *Matosky*, he states that this is recognized complication of a D&C procedure with increased risk in the post-

partum patient (and Plaintiff was four weeks post-partum). *Id.* Indeed, Defendant does not go so far as to argue that Dr. Ingaglio's theory lacks enough study, testing, peer review, or acceptance in the medical community. *See generally* Mot., ECF No. 17; Reply, ECF No. 21.

However, Defendant does argue that Dr. Ignanlio, like the doctor in *Matosky*, did not consider all the evidence and simply ignores contradictory opinions. Mot. 8, ECF No. 17. But unlike in *Matlosky* in which the excluded expert ignored the plaintiff's viral syndrome, here Plaintiff did not present with a fever, nor extreme tenderness in her uterus, which Dr. Ingaglio notes would have indicated an infection and could lead to weakening of the internal tissue. Dr. Ingaglio Dep. Tr., ECF No. 17-9, at 30:23-25, 31:1-19. He further recognizes that she did seek treatment for a soft tissue infection and a c-section infection before she came to the army hospital, which he explains may have caused the foul odor in right broad ligament, which was described as likely necrotic. *Id.* at 31:17-19; Dr. Ingaglio Report 3, ECF No. 17-8. He does not ignore the contradictory opinion of Dr. Keyser who likened Plaintiff's post-D&C uterus to a gangrenous ankle. Dr. Ingaglio Dep. Tr., ECF No. 17-9, at 67:5-9. Rather, he suggests an alternative explanation, which is based on documented medical evidence in the pathology report, that the foul odor came from the outer skin that may have been infected, rather than a pre-existing internal injury, and that the weakened tissue was limited to one area which Dr. Keyser overstates. *Id.* at 66:9-15, 67:5-11.

Dr. Ingaglio reviewed pertinent portions of the army hospital's inpatient and outpatient medical record (Mot. Ex. 3, 5, 6, ECF No. 17) prior to providing his written report dated April 18, 2018. (Mot. Ex. 7, ECF No. 17). *Id.* at 22:23-23:7, 24:14-25:1. Dr. Ingaglio also reviewed the depositions of Dr. Keyser and Dr. Khamsi who were the two physicians at the army hospital who performed the D&C. *Id.* at 23:21-25. Indeed, Defendant's Motion does not

specifically identify what information Dr. Ingaglio failed to consider. While Dr. Ingaglio may not agree with testimony of Defendant's physicians, this does not mean he has failed to consider all relevant information. His opinions are reliable and based on sufficient information.

## CONCLUSION

Because Dr. Ingaglio is qualified and has given reliable and relevant opinions regarding Plaintiff's allegations, the Court denies Defendant's Motion to exclude Dr. Ingaglio's testimony.

Accordingly, **IT IS HEREBY ORDERED** that Defendant United States of America's "Opposed Motion to Exclude the Testimony of Plaintiff's Expert, Dr. James Ingaglio" is **DENIED**.

**SIGNED** this **26th** day of **September 2018**.

THE HONORABLE DAVID BRIONES
SENIOR UNITED STATES DISTRICT JUDGE